The next argument is in Appeal 1528 from 2008, Ritchie v. Vast Resources. Good morning. Welcome to the court. Please proceed. I'm Ed Dukowitz. I represent the appellant. Hold the mic a little bit closer, please, so we can hear everywhere. I'm Attorney Ed Dukowitz. I represent the appellant, Ritchie v. Raynard, in this case. Much better. Thank you. May it please the court, the issues raised by the appellant in this case are three. Claims construction, damages, entitlement to damages, royalty, and the last, actually three and a half, because the injunction was lifted after the filing of the brief, so I didn't cover that in my initial brief. But we argued against it in the rebuttal, so I'll go forward with that. As far as claims construction, it is our position that the court, the district court judge, had limited certain terms to mean various things in contravention to those terms as they appear in the dictionary. The first one is lubricious. In the dictionary, the word lubricious means either slippery or smooth. The district court judge ruled that it meant slippery. Where's the problem? I'm not following you. Well, he narrowed it to mean only slippery, but not to be slippery or smooth. Well, how does that hurt you? I don't understand. Well, because we feel that it should be both. We should be given the full breadth of the definition, and there was no limiting of the definition. Well, I take it that if something is smooth enough, it thereby becomes slippery, so I'm not sure that there are two separate and independent qualities. But the judge separated them. That's the problem. The definition is that it's smooth or slippery, and the appellee had argued that they had addressed lubriciousness as a separate issue and smoothness as a separate issue in the patent itself. However, the word slick appears, which means smooth and slippery. So you have a dictionary definition of smooth or slippery. You have smoothness, you have slipperiness or lubriciousness, and then you have smooth and slippery, all appearing within the specification. And we think that the definition of that word should be expanded to include smooth or slippery, so it takes in both the texture of the surface and the effect. As far as the term bend... Which term? Bend, B-E-N-D. Thank you. The term bend was limited to that which was an angle, having an angled configuration. Again, the dictionary says it could be either curved or angled. In the patent prosecution, the word bend was added during a rejection during an office action. The items cited by the examiner were all straight, and in defining the word bend, in injecting the word bend into the claim, the patentees alluded to, well, the bend is an angle, or the bend is an angled configuration. And the district court said, well, you said it was angled, therefore it is angled, although there is no reason in the prior art cited, and there is no reason in the argument, to say that the word bend does not include being curved. What difference does it make in this exact case? This is a sex toy case. No, I understand that, but... Some sex toys have a radial curve. Yeah, but we are only interested in the ones that were the subject of the findings in this case. Well, some of the items were not allowed in as infringing items because they were curved. I see. Thank you. There was one in particular, a confetti curve, which was a radial curve. So it did make a difference in terms of which products infringed and which didn't. As you can tell, in just the marketplace, it would expand the amount of coverage that was there. So that is our position on that. The other term would be spherical, which we argued to be generally rounded, and the patentee said, use the term spherical, which in a definition, in the dictionary means globular or rounded-like, globe-like. And the court applied that, although the appellees have argued that it means specifically having a fixed diameter or fixed radius, whereas our definition would be generally rounded and having a rounded curve. So you won on this claim construction argument. Well, it was limited to being ball-like, whereas one of the things that's included in generally rounded is knobs. In the patent, the specification, the sentences, all the embodiments have a unique group of knobs, comma, or spheres, comma, and they perform various things. Five of the embodiments have spheres. Only? Only. One of the embodiments has spheres and knobs, which is a sphere with a conical tip. And so by saying they have to have a combination of spheres and knobs... Okay, so again, it excluded certain products even though it included others. Right. It would make that last embodiment impossible to say if it was one or the other because it has both. So our argument is that it does include both. And lastly, as far as the images go, Poly America was set to be held controlling because it was a corporation. Our client says it's an S chapter, and under internal revenue rules, all profits must pass through the S corporation to the individual holders. And the court said no because you're incorporated, that you can't claim the images. Whereas the IRS would require that the images pass through. And so if this court holds that they're not entitled to the images, then this court is holding that the IRS has to rethink what it can do to people who are not passing through profits through S corps. Well, why isn't that subject to the response that they're two different legal regimes and they don't have to be identical? Well, Poly America deals with two separate corporations. They're sister corporations, but they're not S corporations that I know of. And so Poly America said that one company that owned the patent was suing, but the other company made the product and made the profit. They could not get the profits because of the Poly America decision. Whereas we're saying that although the people that own the corporation are individuals, they own an S chapter corporation. Therefore, under law, the profits must pass through. Every year they can't bank profits in an S chapter corporation. Okay. Now, as I understand it, you had sought to reserve 10 of your 15 minutes for rebuttal. You've already used up about seven and a half minutes. So do you want to stop at this point? It's up to you. Yes, Your Honor. I'll argue the injunction in the other part because that's what they'll argue. All right. Mr. Harris, I understand that you want to use 12 minutes of your 15 for a principal argument and then you're going to use three minutes for rebuttal on the cross, right? That's correct. Okay. Go ahead. May it please the court. I'm going to concentrate on only two issues, validity and the inducing infringement. I've briefed everything else and I think we've responded to everything else. This is classic obviousness. Whether you go under the Graham test or the more recent KSR test or even go back more than 100 years to Hotchkiss, the only thing that this patent differs, claims to an independent claims at issue, is adding borosilicate glass to glass sex aids. It's Pyrex, right? Pyrex. And maybe I'll use Pyrex as a shorthand. Pyrex is the popular name for borosilicate? It's a trade name. It used to be Corning's and I don't know that it is still Corning's, but it is a trade name for borosilicate glass. Glass sex aids are old. Plaintiff's website said... Well, how many different forms of glass are there that these sex stimulators are made out of? As far as I know, there are two. Conventional glass, which... Well, wait. I don't think there's such a thing as conventional glass. There are a zillion different types of glass. Bulletproof glass, frosted glass. You're correct, Your Honor, but the first glass sex aids were 2,000 years ago, probably in the Roman Empire. But I don't see the relevance of that because there are more varieties of glass now than there were 2,000 years ago. Suppose there's an infinite variety of glass because you can make glass out of all sorts of different things. It doesn't just have to be silicon. And you can strengthen it, weaken it, make it more transparent, make it translucent, and so on. So, what is the variety of glass that's used in these sex instruments? As far as I know, the original... Is there anything in the record on that? Yes. Mr. Sager, who was the glass blower that the plaintiffs employed, talked about something called soda-lime glass, which I've called conventional glass because it's the glass in windows and it's almost always the glass used. I'm not talking about leaded glass or stained glass. We're talking about glass that is normally used for glass... What about the glass used in bottles? Is that identical to the glass used in... It might be colored because... But it's all the soda-lime glass? Yes. Yes, as far as I know. So, all these sex instruments are made out of soda-lime glass except, of course, the plaintiffs. No. Now they're almost exclusively made out of borosilicate glass as far as we can tell. In the prior art? No, not in the prior art. Not in the prior art. The written prior art does not disclose borosilicate glass. Does the written prior art call it soda-lime glass or just not bother to call it? No, it doesn't call it. It just calls it glass.  Because no one thought that the precise composition of the glass had any relevance to the sexual objectives. The latter, your honor. Some of the prior art, for example, was just novels that talked about glass dildos and there's no discussion of the exact composition. So, is the plaintiff the first inventor, producer, what have you, who discovered that if you made these things out of a different type of glass, maybe they would be more effective? Yes. At least that's what the record shows. So, why is that so obvious? Because borosilicate glass is known to have at least two particular properties and the two properties that are important to this case. One is it's hard. And so if it's harder than regular glass, more difficult to break. So, if it's in somebody's orifice, it's less likely to break and you'll have glass hurting somebody. And the second is that if you heat it quickly or cool it quickly, it won't crack. And even Mr. Raynard acknowledged that there were advertisements for Pyrex that said from the freezer to the oven without cracking. That was a well-known problem. Wasn't there a third property mentioned in the patent having to do with resisting bacterial infusion? Well, the claim says that it's resistant to chemicals, bacteria, and electricity and temperature changes. Four different things. Four. Those are all properties of Pyrex, right? Those are properties of Pyrex, and frankly, I don't know. And they're properties of a lot of different materials. They're properties of regular glass, too. But to a lesser degree. For some, a lesser degree. I don't think there's any evidence that regular glass is less resistant, regular meaning sodaline glass, is less resistant to electricity. I think Pyrex is actually a better insulator than sodaline float glass. Well, but then we get to the question of what does resistance to temperature and resistance to electricity mean? In the patent, it seems like resistance to temperature means that the glass doesn't change, that when you apply a sudden change in temperature, it won't crack. You need a parallel construction to the electricity. So that applying a high load of voltage, say, current, it's not going to crack. Some of these things, like electricity... Why does that have any relevance here? Because it's in the claim. No, I understand that. But what does cracking under electrical current have to do with this particular kind of device? It would be particularly exotic. It goes to proving infringement. I don't think so. It goes to proving infringement. And does top-ghost devices are they resistant to sudden changes in voltage? And there's no evidence of that. But on the validity issue for a moment, so if Pyrex has been around for a long time, and it has some properties which might be relevant to the product, how is it that no one thought of it earlier? I mean, if things are obvious, you expect them to be discovered early. I don't know how long it has been Pyrex, but there have been these glass dildos for 2,000 years, and Pyrex, say, for 50 years. More than 100 years. 100 years of Pyrex. Pyrex is from the 1880s, I believe. If Pyrex is 130 years old, why has no one thought of this before? I don't know the answer to that, and there's nothing in the record on it. If I were speculating, I would just say that society got more open to sex toys in the 80s and 90s, and maybe even earlier, and this was just a natural progression. But there's no evidence of that in the record, frankly. Do we know anything in the record about tests or expenses incurred by the plaintiff to discover that Pyrex could be used for this purpose? No, Your Honor. They went to a glass blower. The glass blower used 5-foot-long Pyrex solid rods and formed these sex aids out of it. There was no experimentation as far as I know. The experimentation went to the shapes, not to the material, and there was no how much boron oxide should we put in the glass. Nothing like that. It was just merely... Were there specific issues litigated with respect to obviousness? I'm not sure I understand the question. This issue was certainly litigated. What were the underpinning disputes? The underpinning disputes really were whether prior art that taught glass sex aids taught away from borosilicate glass sex aids, merely because they mentioned alternatives. The best prior art, Jacobs, taught a glass sex aid, but it also taught flexible material made in molds, and the court held that those alternatives taught away from using glass. But there's no criticism. You'll have to explain to me as an outsider. I had trouble with taught away as a concept. Is the idea that it fools people? No, Your Honor. I think what it means is that prior art specifically says, don't try this line of investigation because we've tried it and it doesn't work. Right. It throws them off the scent, so to speak. That's right. People of ordinary skill assume that that's not the way to go. How would that work here? I don't know. It doesn't work here. The other thing is that the prior art specifically taught to use borosilicate glass rods in a thermometer. It could apply. Hypothetically, a particular glass, let's call it borosilicate glass that has slightly more boron in it than Pyrex, could be potentially poisonous. Somebody could have said that out there. If they hadn't, they said, don't use Pyrex because it borders on something that could be poisonous if placed in the human body. That would be teaching away. It just doesn't happen to be the case. It doesn't happen to be the case. Not only that, there's prior art glass thermometers that are made out of borosilicate glass that are for insertion into human orifices. Right. To follow up on Chief Judge Michel's question, I take it that your position is that, number one, the entire generally lubricous, glass-based material, dot, dot, dot, with all of the various properties, that's just a description of borosilicate glass. It's not as if it adds any special components that aren't present inherently in borosilicate glass, correct? Yes. Okay. Now, so your position, I take it then, is that the only issue here is the conversion from glass, sodaline glass, to Pyrex. That change is the sum and substance of the inventive component of this patent. There's nothing else, whether it's the shape of the items, the spherical, the knobs, nothing. None of the rest of it is new. It's just the glass, change it into a different form of glass, correct? Correct, and that's what the examiner said, at least in the first office. And you have an admission that you cite a few times in your brief. Oh, and the plaintiff, Mr. Raynard, said the only thing we invented was borosilicate glass. Okay, so really the question on obviousness is very narrow. It is just, as you see it at least, it is just, is there a protectable inventive component to going from sodaline glass to Pyrex? Yes, as far as obviousness goes. Is the amount of oxide of boron in borosilicate, is that a standard percentage, or does that vary? It does vary to some degree, and that's part of the problem with our enablement argument, which is fully briefed. But the district court held that an appreciable amount of oxide of boron meant any measurable amount. And the evidence was that certain appreciable amounts, a low percentage, would give the device none of the properties that borosilicate glass has, so that it's our position that the full extent of the claims are not enabled. But, I mean, is there a standard percentage, or could the plaintiff have made some special form of this glass? Yeah, if the plaintiff had made some special form. But that's not claimed, because it's just the appreciable. Right. So he's not claimed. But didn't the district judge, in effect, define or construe appreciable to mean sufficient, that it had to be not only measurable, but adequate to cause these properties against electricity and so forth? No, the district court just held that it meant measurable amount. I believe that that's the plaintiff's position. Well, but even if you construe appreciable that way, it's followed by language which says appreciable amount to render it lubricous, resisted heat, etc. So, by definition, regardless of how you define the word appreciable, the claim requires that these properties be present, right? Yes, that's true. But there's no guidelines in the patent to say what the appreciable amount should be. Right, but then don't we ask whether the ordinary artisan in the glass forming arts would know exactly how much borosilicate would have to be added in order to achieve the properties that are called out in the claim? Well, those properties, there's no evidence that borosilicate glass makes glass more smoother or slippery. I thought there was testimony that all glass is slippery and boron-based glass is extra slippery. I thought that one of the expert witnesses of the glass people said that. As a matter of fact, the evidence was to the contrary. The plaintiff inventor said no glass is slippery when it's dry. Their expert did say that there is some evidence that borosilicate glass has a slightly lower coefficient of friction. But that doesn't necessarily make it slippery. Just because it has a slightly lower coefficient of friction, if this desk is rough and I sand it a little and it becomes less rough, so a lower coefficient of friction. No, you need more liquid to make a rougher surface slippery. Well, that's the whole key. So if the coefficient of friction is lower, you need less liquid to render it slippery. But nothing in the patent discusses that. No, no, that's pretty obvious. That is obvious. But the inventor himself said no glass is slippery without lubrication. That's true, but you require different amounts depending on its smoothness. There's no evidence of that. No, no, that's obvious, right? No, not really. I don't think so, because you put on lubrication. This is simple physics, right? The smoother the surface that has to avoid friction with what it encounters, the less lubricant you need. I mean, it seems to me that Judge Posner has to be right, whether there's evidence in the record or not. It's a plain principle of physics. It may be. It is a plain principle. And you have limited lubrication. If what you're using is bodily fluids, it's lubricants, right? It's limited. But mostly it's using artificial lubrication. Well, some, yes. But even then, if the point is, you know, save money because you can use less artificial lubricant because the composition of the glass makes it have a substantially smoother surface, that's arguably an improvement. It's not an improvement that's discussed in the patent. And if you're using natural lubricant, of course, the user doesn't control how much lubrication he or she submits. Right, and that's why you want to minimize the amount of required lubrication by having a very smooth surface. I don't know why you necessarily care about limiting how much lubrication that you use. If the chemical composition of the glass had been minutely specified, would that change your position? It would certainly change my position on indefiniteness and enablement, if the chemical composition, especially on enablement. It would also change my opinion if the claim said borosilicate glass with this composition instead of adding all of these functional things. Should we be viewing slipperiness, lubricity, from the standpoint of claim indefiniteness as separate from the other descriptors in the claim language? That is, can a case of indefiniteness be made solely on the basis that the slipperiness, the lubriciousness, is not explained, not quantified, and therefore a competitor would have a difficult time, arguably, knowing whether he infringes or not, because his device has a certain level of lubriciousness, but he can't tell what the requirement of the claim is, so he doesn't know whether his device falls within the scope of the claim or outside. Therefore, the claim has to be viewed as indefinite. Is that the case here? That's the Halliburton case, Your Honor, and we cited it in our brief. Exactly on point. I think I've used my time. If there's no further questions. All right. Well, we'll give you a little bit of rebuttal time so we preserve symmetry. Thank you, Judge. All right. Thank you. Now, you have something like seven and a half minutes. In response, Your Honor. Thank you. As to validity, one of the things to consider with validity and obviousness is the secondary considerations with the gram court in the case as set out. I think the testimony at trial was that initially the patentees had watched the Internet and had seen no Internet websites at all when they first started selling these things. Their product was then featured on an HBO, et cetera, one of these programs. But the problem I have with obviousness, not that this isn't a genuine improvement. The problem is that a great deal of inventive activity goes on quite outside the patent system. It's just constant small improvements. And this looks to me like a case where someone very ingeniously, intelligently decides, well, there are various forms of glass. Actually, substitute one for the normal glass. And Pyrex is a very common alternative glass. And so you substitute it. And our manufacturers and entrepreneurs are constantly experimenting substitution, a new color, a slightly new shape, something of that sort. Your Honor, I think the question is, why would you then experiment? Why would one experiment with new techniques and new materials? That is one of the issues that were raised. And the issue is that there is no... So if you have to make a tremendous investment in order to discover an improvement or perfect an improvement, that's, of course, a very strong case for patent protection. But if it's the kind of thing that... the kind of incremental improvement that goes on constantly and does not involve a significant expense at all, you're just trying out a new glass. No big deal at all. No big expense. Why does one need patent protection in order to create incentives for that kind of incremental improvement? Because the improvement was made to solve a problem that was unidentified by the industry. The problems solved by the patentees were, number one, odor retention on the surface due to porosity of latex and other acrylics and other types of other substances that were used for making sex toys at that time. Glass was not used. It created a stir. And when people saw the effects of glass, how it retained its... Well, you say glass wasn't used, but we're being told by opposing counsel that glass was used for thousands of years. Glass was used in ancient Rome. And that's not considered prior art because it was made in a foreign country and there was no publication of that at the time. Now, it did show up in textbooks, and the textbooks were admitted into evidence, I believe. Well, why doesn't that count as prior art? Well, that goes to another issue that was also raised as to fraud on the patent office because they didn't know about the textbooks. But the glass that was used, number one, was hollow. All the devices that I saw were hollow in the books. This is a solid device. Number two is those devices... Well, what's inventive there from switching from hollow glass to solid glass? Well, less fracture. Well, it depends on the strength of the glass and the dimensions of the hollowness. So just going from hollow to solid doesn't strike me off the top as necessarily inventive. Well, hollow is a way of teaching away as well because you're showing... Which is the other issue the court raised was what is teaching away? There are several things. One of them is where you say, don't do it. The other thing is where you say, do it my way because this is the way that works. If you lead somebody down a path, not discourage, but lead them in the direction... By the way, is there any indication in the prior art that you shouldn't use borosilicate, that it would have bad properties? You must use sodalime? Not that I know of. Is there any indication in the prior art you're referring to that immediately preceded the alleged invention here that glass was not suitable, that you should be using latex and these other substances you mentioned? Well, the prior art that was cited, which was Jacobs, which is the closest prior art, taught that it was flexible. They had a flexible arm that could... Yeah, but I don't care about closest prior art. Did any of the prior art use glass as opposed to latex, etc., non-glass? I believe Jacobs did, but the use of the glass was an impossibility because one of their descriptions were that all of the devices were flexible. It says, and you can use glass. Well, you can't use glass, not whole glass. You can use glass in one part, but you have to use a flexible component. I'm troubled by the implications of your argument that Pyrex, a very well-known variant on what we've been calling conventional or soda-lime float glass, is, even though all the properties are known and recited in the claim, that that is the substitution of Pyrex for soda-lime float glass is inventive. If I were to come in now to the patent office with Zerodur glass, which is another formulation of glass that actually has better thermal properties and is harder than Pyrex, would I be entitled, in your view, to a patent on that? If you were to show that there was an improvement... It's better than Pyrex, and there are things that are better than Zerodur, and would Judge Michel be able to get a patent on that? You know, all these properties are known. There's no experimentation that's required. All I have to do is look up the properties of each of these types of glass and pick one from the list and run to the patent office. Are those things all patentable in light of KSR? Those properties were not known in the sex-aid industry. One skilled in the art, according to the testimony of Dr. Stern, was that one skilled in the art at the time of the invention would not be aware of the properties. He told the court that, in his interpretation, one skilled in the art would be familiar with the materials used to make sex-aids. However, he then said they would not be aware of borosilicate glass because borosilicate wasn't one of the materials that was used. Mr. Raynard testified that, at the time of the invention, he was the only person that he knew of, skilled in the art of making sex-aids, that was aware of the properties of borosilicate glass. There is no testimony that shows that there was any other person aware of this. There's no problems identified by the industry. Yeah, but look, step one in the decision tree is, do I use latex or do I use glass? And I decide, tentatively, I'm going to use glass. Now, right now, I don't know anything about glass, but once I've made the choice to use glass, I go to Bryson's treatise and I look it up, and I find out about Pyrex and SuperPyrex and SuperSuperPyrex and so on, and I don't do any experimentation. I just pick one from the list, and I go to the patent office and say, my sex-aid is made out of SuperPyrex glass, and so I'm entitled to a patent. I picked it off the list. No experimentation at all. It was an arbitrary choice. I flipped a coin. I blindfolded myself and went down the list, and wherever my finger stopped, that's the kind of glass that I filed for in the patent office. And under the logic of what you're saying, it would be patentable. It would be patentable if you told the patent examiner what problem you were solving by that point. I don't think there's a legal requirement you tell the patent examiner anything about the problem. A lot of people do it, but there's no requirement, so I file my application. I don't say I'm solving any problem. I'm just saying I have a better device with SuperPyrex glass picked off the list arbitrarily. There is no requirement that you solve a problem, but if you are in the middle of an office action, that examiner is going to ask you, and he's going to say, besides, you never told me what problem you were solving. Well, I'd say just as Judge Bryson said to you, SuperPyrex glass is harder and less breakable, etc., etc., than regular Pyrex. And so that's the reason I'm choosing it. That's the improvement. Safer, harder. Yeah, it's a new use for the glass. Pardon? It's a new use for the glass. Something you said earlier troubled me a little. You said most of these things were made out of plastic rather than glass. Latex, rubber, plastic, acrylic, metal. Yeah, but there were glass, not just in the Roman Empire, but in modern... No, not that I know of. Well, Jacobson was at least partly glass, you said yourself. Jacobs said it. Well, I saw the patent, but I wasn't aware of it. I wasn't aware of the product. I thought you were talking about products in the marketplace. No, no, no, we're talking about prior art, patents and printed publications. Jacobs listed a device that was made of, I believe it said it was made of materials, but it was more than one. And they said that one of the requirements, that all embodiments were flexible so that they could be bent. There's a hook. Yeah, yeah, yeah, but wasn't part of that particular prior art that a portion of the device was made from glass? They said the word glass. They didn't describe how it was made or... No, no, no, but it identified glass as being something that you can use for at least a portion of the total device. Yes. So then I say to myself, hell, I'll just make the whole device out of glass. What's inventive about that? But if you follow Jacobs, you'd have to find a way to make it flexible because that's the way they taught you to make it. Well, you don't have to follow everything in every prior art. You're allowed to pick and choose one feature from prior art A and a different feature from prior art B and so on. I think it comes down to which problems you solve. And once again, there are no problems identified in any testimony that the industry was looking at. The KSR case found that they were going to develop this foot switch bracket because everybody was working on it and that's what they were doing. Don't take up a lot of time on that. We know what KSR says well enough. Anything else on your rebuttal argument? I believe I'm out of time. All right, thank you. Mr. Harris, you have a few minutes, about three. I hope not to take that long, Your Honor. Just briefly, secondary considerations. There was no evidence of what other people sold. Plaintiff's products were not introduced into evidence with the exception of one of their products that I held up during my opening statement. So your point being that no nexus was shown between the claimed features and the good sales, et cetera? That's right. The other part of commercial success was testimony of one of the plaintiffs that he had 300,000 Google hits for the phrase glass dildo. But he said, I don't know what those mean. I don't know if there's any duplicates. Jacobs is solid. It's not hollow. And although we don't have any evidence of what the five glass dildos mentioned in these books, which are from the 60s, 70s, and 80s are, we don't know whether they're solid or hollow, but there's certainly evidence of glass dildos, not with regard to whether part of it is flexible or not. That's all I have, Your Honor. All right, we thank you both.  Thank you, Your Honor.